**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **CHELSEA R. FOSTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No.: 3:13-516** |
| | ) | **Judge Sharp** |
| **EMILE AMARNEK and DAVID L. MEKTON,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the Court is the fully briefed Motion for Judgment on the Pleadings filed by Defendants Emile Amarnek and David L. Mekton (Docket No. 43). For the reasons that follow, the Motion will be granted.

## I. BACKGROUND

This litigation began on April 15, 2013, when Plaintiff filed a Complaint against Douglas Knight & Associates, Inc. ("DKA") in the General Sessions Court of Davidson County, Tennessee. Upon removal of the action, DKA filed a Motion to Dismiss, after which Plaintiff took a voluntary dismissal as to DKA and filed an Amended Complaint naming Defendants Amarnek and Mekton, respectively the Chief Operating Officer and Chief Executive Officer of DKA.

Plaintiff's complaint stems from a January 31, 2013 letter from DKA which stated that Plaintiff "may be legally responsible" for $5,694.63 in damages to Grange Insurance as a result of a traffic accident she had with Ronald Roark. (Doc. 20, Amended Complaint ¶ 8) . Plaintiff also alleges that "the letter went on to further state that 'a violation of financial responsibility occurred in this matter,' and that, 'it is our intention to forward a petition to the Department of Motor

Vehicles requesting the suspension of your driving privileges.'" (Id. ¶ 9). Plaintiff received a subsequent letter that simply stated "the balance of the claim . . . has decreased from $5,694.63 to $5,409.21" and requested that Plaintiff contact Jasmina Arkinson, a "Subrogation Specialist." (Id. ¶ 10).

Plaintiff admits that she was in a traffic accident with Mr. Roark, but denies that she was to blame. She also asserts that no court has found her liable, let alone for either of the amounts requested in the letters.

Plaintiff alleges that as a result of her receipt of the letters, she "became severely depressed, as she is the primary caregiver for a small child and was without the means or the ability to pay the $5,694.63 demanded by Defendants." (Id. ¶ 16). Plaintiff further claims she "feared Defendants would carry out their threat to report Plaintiff to the Department of Motor Vehicles . . . [and] that her license would be suspended," and became so depressed that she sought medical care on March 8, 2013. (Id. ¶ 17).

Based upon the letters, Plaintiff brings federal and state law causes of action. On the federal side, she claims that Defendants' actions violated multiple provisions of the Fair Debt Collection and Practices Act, 15 U.S.C. § 1692, (Count III) and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (Counts IV & V). On the state side, she claims that as a result of Defendants' action she was subjected to both intentional and negligent infliction of emotional distress (Counts I & II).

## II. STANDARD OF REVIEW

A Motion for Judgment on the Pleadings under Rule 12(c) of the Federal Rules of Civil Procedure "is appropriately granted 'when no material issue of fact exists and the party is entitled

to judgment as a matter of law.'" See Tucker v. Middleburg-Legacy Place, 539 F.3d 545, 549 (6th Cir. 2008). In making that determination, the Court utilizes the same standards as those used to determine if the Complaint is subject to dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Id.

In considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court must take "all well-pleaded material allegations of the pleadings" as true. Fritz v. Charter Township of Comstock, 592 F.3d 718, 722 (6th Cir. 2010). The factual allegations in the Complaint "need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." Id. (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009)). "'A legal conclusion couched as a factual allegation,'" however, "need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient." Id. (quoting Hensley Mfg. v. ProPride, Inc., 579 F.3d 603, 609 (6th Cir. 2009) and Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)).

## III. ANALYSIS

### A. FDCPA Claim

"The Fair Debt Collection Practices Act, codified at 15 U.S.C. § 1692, was passed to 'eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.'" Clark v. Main Street Acquisition Corp., 2014 WL 274469, at *2 (6th Cir. Jan. 27, 2014) (quoting 15 U.S.C. § 1692). "At its core, the Act bars 'conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt.'" Id. (quoting 15 U.S.C. § 1692d).

"The statutory language imposes two threshold criteria that limit its scope: The FDCPA regulates only the conduct of 'debt collectors' and only communications made 'in connection with the collection of any debt.'" Estep v. Manley Deas Kochalski, LLC, 2013 WL 185391, at *2 (6th Cir. Jan. 16, 2014) (citation omitted).

"As is plain from the statutory text, liability under the FDCPA attaches only to a defendant that qualifies as a 'debt collector,' which is a statutorily defined term." Bridge v. Ocwen Fed. Bank, FSM, 681 F.3d 355, 364 (6th Cir. 2012). Specifically, a debt collector is

> any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. . . . [T]he term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts.

15 U.S.C. § 1692a(6). Also, the FDCPA only applies to a "debt" which is defined as

> any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

15 U.S.C. § 1692a(5).

Although apparently not addressed by the Sixth Circuit, several circuits have held that collection practices "involv[ing] conventional tort claims in which the liability arises from tortious activity [and] not from a consensual transaction" are not covered by the FDCPA. Rawlson v. Law Office of William M. Rudow, LLC, 460 F. App'x 254, 257 (4th Cir. 2012) (citing Fleming v. Pickard, 581 F.3d 922 (9th Cir. 2009) (tortious conversion); Turner v. Cook, 362 F.3d 1219 (9th Cir. 2004) (business interference torts); Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367 (11th Cir. 1998) (car accident)). This is in keeping with the notion that, "at a minimum, a 'transaction' under

the FDCPA must involve some kind of business dealing or other consensual obligation." Oppenheim v. I.C. Sys., Inc., 627 F.3d 833, 838 (11th Cir. 2010) (citation omitted); see also Fleming v. Pickard, 581 F.3d 922, 926 (9th Cir. 2009).

The Fourth Circuit's decision in Hawthorne is particularly instructive. There, plaintiff was involved in an automobile accident allegedly resulting from her negligence. After Liberty Mutual (the other driver's insurer) paid its insured's claim, Liberty Mutual provided Mac Adjustment with subrogation rights to the $2,020.18 it claimed Plaintiff owed. Thereafter, Mac Adjustment sent plaintiff one letter, asking that she provide the name of her insurance company or arrange to make payments.

For two primary reasons, the Fourth Circuit affirmed the district court's grant of a motion for judgment on the pleadings. First, the court held that the alleged obligation to pay was not a "debt," writing:

> By the plain terms of the statute, not all obligations to pay are considered "debts" subject to the FDCPA . . . . Rather, the FDCPA may be triggered only when an obligation to pay arises out of a specified "transaction." Although the statute does not define the term "transaction," we do not find it ambiguous. A fundamental canon of statutory construction directs us to interpret words according to their ordinary meaning. . . . The ordinary meaning of "transaction" necessarily implies some type of business dealing between parties . . . . In other words, when we speak of "transactions," we refer to consensual or contractual arrangements, not damage obligations thrust upon one as a result of no more than her own negligence. . . . Because [plaintiff's] alleged obligation to pay Mac Adjustment for damages arising out of an accident does not arise out of any consensual or business dealing, plainly it does not constitute a "transaction" under the FDCPA. Moreover, the fact that Mac Adjustment may have entered into a contract with the insurer for subrogation rights does not change the fact that no contract, business, or consensual arrangement between [Plaintiff] and the damaged party, its insurer, or Mac Adjustment exists. Consequently, the FDCPA does not apply because this is not a transaction.

Hawthorne, 140 F.3d at 1372-73 (internal citations omitted). Second, the court held that the alleged obligation to pay was not a debt arising from a consumer transaction, writing:

> [T]he statutory language further limits application of the FDCPA to debts arising from consumer transactions . . . . Quite simply, [plaintiff's] alleged obligation to Mac Adjustment does not arise out of a consumer transaction; it arises from a tort. In conducting herself in an allegedly negligent manner that precipitated an accident, Hawthorne engaged in no consumer transaction. She neither purchased nor used goods or services. Rather, [plaintiff] finds herself indebted to Mac Adjustment because she allegedly failed to conduct herself with the reasonable care that society demands of all of us, and she cannot somehow transform this payment obligation arising out of an accident into a consumer transaction.

Id. at 1373 (internal citations omitted).

Hawthorne, of course, is not controlling, but it is persuasive and focuses on the clear language of the statute. Plaintiff does not argue otherwise. Instead, she argues this case is distinguishable based upon the language of the letters. The letters read:

| **HAWTHORNE LETTER** | **DKA LETTER** |
|---|---|
| The above captioned subrogation claim resulting from your negligence has been referred to us to bring to a conclusion. If you had liability insurance to cover this accident, kindly note the name of your Insurance Company and policy number on the bottom of this letter and return it to us. If you did not have insurance and wish to resolve this matter voluntarily, send your check for the full amount of the claims by return mail.<br><br>In the event that you are without insurance and you cannot remit payment immediately, please call our office AS SOON AS POSSIBLE to make arrangements to get this matter resolved. | This office has been retained by GRANGE INSURANCE, who insured RONALD ROARK on the above described date of loss. An investigation into this loss reveals that you may be legally responsible for the damage claim amount of $5,694.63.<br><br>According to our documentation, a violation of financial responsibility occurred in this matter as the vehicle being operated was not covered by a valid liability policy. If permissible, it is our intention to forward a petition to the Department of Motor Vehicles requesting the suspension of your driving privileges.<br><br>Contacting the undersigned upon receipt of this notice and making valid payment arrangements may avoid the above listed action.<br><br>Please forward your valid insurance information for the above date of loss to our office immediately, if applicable. |

Plaintiff argues that the letter in Hawthorne was "relatively innocuous," whereas the letter she received presented an altogether different message because, "as interpreted by Plaintiff, . . . a formal investigation had occurred, Plaintiff had committed a violation of 'financial responsibility,'"

and that "unless Plaintiff paid the very specific amount of $5,694.63 Defendants would contact the Department of Motor Vehicles and have her driver's license suspended." (Docket No. 46 at 5). That may be so, and Defendants may well be advised to change the tone and eliminate threats, veiled or otherwise, in the letters they send. But that is beside the point; either the letter relates to a consumer debt and consumer transaction covered by the FDCPA, or it does not.

Plaintiff also argues that the result in Hawthorne may have been decided differently if it had the "components of *scienter* and misconduct" alleged in this case. In support of that argument Plaintiff relies upon Broadnax v. Greene Credit. Serv., 1997 WL 14777 (6th Cir. Jan. 15, 1997).

Broadnax, an unpublished decision, is inapposite. The case involved a collection agency's efforts (including taking out a criminal complaint) to collect on a check cashed at a supermarket that was returned for insufficient funds. At issue was whether "the subject debt which the defendants had attempted to collect from plaintiff constituted a *commercial* obligation (rather than a *consumer* debt) which escaped the reaches of the FDCPA." Id. at *2. After quoting the definitions for a "debt" and "consumer," the Sixth Circuit held that "by attempting to collect a debt evidenced by a personal check which had been cashed by an individual at a supermarket, the defendants sought to satisfy a purported consumer obligation." Id. at *3.

Key to the decision was that the "debt" arose from a consumer transaction. In fact, the court began its substantive discussion by observing that, "[u]nder the FDCPA, certain abusive collection practices are actionable, but *only* where the underlying debt is a *consumer* debt. 15 U.S.C. §§ 1692(a), 1692a(3) & (5)." Id. (emphasis in original). Even the passage from Broadnax which Plaintiff in this case quotes and highlights bears out the fact that the Sixth Circuit's concern was with whether the collection at issue related to a consumer debt: "For a *consumer debt collector* to

intentionally and falsely accuse the collection target of fraudulently negotiating a bad check in a *consumer transaction* at a grocery store, and to initiate a criminal complaint against that person substantiated by such false accusation, in an attempt to exert pressure upon the target, would, if proved, unquestionably constitute a species of behavior by a *consumer debt collection* agent which Congress intended to deter, and expose to punishment, by enactment of the FDCPA." Id. (emphasis added).

This case simply does not involve a consumer debt arising from a consumer transaction. It arises from an alleged tort, not a consensual or business transaction entered into by a consumer. Judgment on the pleadings is therefore appropriate with respect to Plaintiff's FDCPA claim.

**B. RICO Claims**

In Count IV, Plaintiff alleges that Defendants committed mail fraud in violation of 18 U.S.C., § 1862(c), and, in Count V, that they conspired to commit mail fraud, in violation of 18 U.S.C. §§ 1962 (c) & (d). Section 1962 make it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt ." 18 U.S.C. § 1962(c). Thus, in order "[t]o state a RICO claim, a plaintiff must plead the following elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" Ouwinga v. Benistar 419 Plan Serv., Inc., 694 F.3d 783, 793 (6th Cir. 2012) (quoting Moon v. Harrison Piping Supply, 465 F.3d 719, 723 (6th Cir. 2006)). Further, "[t]o plausibly state a claim for a violation of 18 U.S.C. § 1962(d), plaintiffs must successfully allege all the elements of a RICO violation, as well as alleging 'the existence of an illicit agreement to violate the substantive RICO provision.'" Heinrich v. Waiting Angels Adoption

Serv. Inc., 668 F.3d 393, 411 (6th Cir. 2012) (quoting United States v. Sinito, 723 F.2d 1250, 1260 (6th Cir. 1983)). "'An agreement can be shown if the defendant objectively manifested an agreement to participate directly or indirectly in the affairs of an enterprise through the commission of two or more predicate crimes.'" Id.

Plaintiff bases her RICO claims on the allegations that Defendants are the CEO and COO of DKA, that they "provide various services through their enterprise, DKA, including a service they term as 'subrogation collections.'" Plaintiff continues:

> 19. Defendants committed acts of racketeering within the meaning of 18 U.S.C. § 1961 by transmitting their letters to Plaintiff dated January 31, 2013 and February 6, 2013 via the United States Postal Service in violation of 18 U.S.C. § 1341.
>
> 20. Upon reason and belief, Defendants have committed further acts of racketeering by transmitting such form letters to individuals in various other states.
>
> 21. The racketeering acts committed by Defendants constitute a pattern of racketeering activity within the meeting of 18 U.S.C. § 1961(5) in that they are related to one another and continuous. The racketeering activities seem integrated into Defendants' business practices, and appear that they will continue into the future, possibly for years.
>
> 22. As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiff has suffered injury to her property, including current and future medical expenses, legal fees, and court costs.

(Docket No. 19, Amended Complaint ¶¶ 3, 4, 7 & 19-22). Even assuming these allegations are more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," for purposes of the pleading requirement under Rule 8(a) of the Federal Rules of Civil Procedure, Twombly, 550 U.S. at 555, they do not meet the heightened pleading requirements necessary for a RICO claim.

"When pleading predicate acts of mail or wire fraud, in order to satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must '(1) specify the statements that the plaintiff

contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Heinrich, 668 F.3d at 405 (citing Frank v. Dana Corp., 547 F.3d 564, 570 (6th Cir.2008)). "Generalized and conclusory allegations that the Defendants' conduct was fraudulent do not satisfy Rule 9(b)." Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 361 (6th Cir. 2001). "'The courts have uniformly held inadequate a complaint's general averment of the defendant's knowledge of material falsity, unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading.'" Heinrich, 668 F.3d at 406 (quoting Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992)).

Plaintiff's RICO allegations are conclusory and speculative at best, and lack particularity. She does not detail the predicate acts or adequately identify what constitutes the pattern of activity, nor does she allege scienter or the basis for an agreement. Instead, her RICO claims are grounded upon "reason and belief" with the anchoring premise being that D&K "seems" to be in the business of committing "racketeering activities." The Court finds the allegations insufficient as a matter of law to establish RICO claims under 18 U.S.C. § 1862. See Goldstein v. Bank of Am., N.A., 2010 WL 1252641, at *6 (W.D. N.C. 2010) ("Speculation of wrongdoing by [defendants] is an insufficient basis for asserting a civil RICO" claim); Quade v. Rodriguez, 2009 WL 2170146, at *6 (E.D. Tenn. July 29, 2009)(RICO plaintiffs must "'set out a reasonable and principled to basis of recovery' that is 'not based on mere speculation and surmise'") (citation omitted).

Further, "while two [predicate] acts are necessary, they may not be sufficient," to state a RICO claim. H.J. Inc. v. Northwestern Bell Tele. Co., 492 U.S. 229, 237 (1989). Assuming that the two letters Plaintiff received in this case are proper predicate acts, they are insufficient to suggest

that there exists acts that "amount to or pose a threat of continued criminal activity," id. at 239, as required to plead a RICO claim.

**C. Intentional and Negligent Infliction of Emotional Distress**

Plaintiff's intentional and negligent infliction of emotional distress claims are subject to dismissal as well. To plead the former a plaintiff must allege (1) the conduct of the defendants has been so outrageous in character, and so extreme in degree, as to be beyond the pale of decency, and to be regarded as atrocious and utterly intolerable in a civilized society; and (2) the conduct results in serious mental injury. Rogers v. Louisville Land Co., 367 S.W.3d 196, 201 (Tenn. 2012). To prove the latter, a plaintiff must "establish the elements of a general negligence claim: (1) duty, (2) breach of duty, (3) injury or loss, (4) causation in fact, and (5) proximate causation," as well as "the existence of a serious or severe emotional injury that is supported by expert medical or scientific evidence." Lourcey v. Estate of Scarlett, 146 S.W.3d 48, 52 (Tenn. 2004).

Both causes of action contain a "'severe mental injury' element," which "occurs 'where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.'" Rogers, 367 S.W.3d at 210. "'[T]oo much trivial or modest emotional disturbance occurs in modern life for the law to attempt to provide universal peace of mind,'" and the severe mental injury component helps "to avoid the judicial system being flooded with potentially fraudulent, manufactured, or overstated claims arising from the 'transient and trivial' emotional distress of daily life[.]" Id. (citations omitted).

Plaintiff does not come close to adequately pleading an intentional emotional distress claim, *i.e.* that Defendant's conduct in sending the letters was outrageous. "This is an exacting standard," which, as noted, requires that a defendant's conduct be outrageous and beyond all bounds of

decency. Miller v. Willbanks, 8 S.W.3d 607, 614 (Tenn. 1999).

Nor do Plaintiff's allegations establish a viable negligent infliction of emotional distress claim. Plaintiff argues that she "is a single mother of limited means who was unable to comply with Defendants' demand for payment," that she "feared that Defendants would carry out their threat to report [her] to the Department of Motor Vehicles," and that a defendant "must accept the person as he finds him." (Docket No. 46 at 11). However, as the Tennessee Court of Appeals pointed out in Brown v. Mapco Express, Inc., "in the elements that must be established for a claim of negligent infliction of emotional distress, the requirement that the stimulus conduct be extreme and outrageous is interwoven with the 'reasonable person' component of the element of serious or severe emotional injury." 393 S.W.3d 696, 706 (Tenn. Ct. App. 2012). "In effect, the plaintiff must prove that the conduct giving rise to his claim was so extreme and outrageous that it would have caused a reasonable person to suffer serious or severe emotional injury." Id.

Brown involved a case where a customer sued Mapco after a clerk at one of its gas stations accused Plaintiff of a "money switch" and threatened to call the police. Noting that plaintiff had alleged that he consulted medical professionals because of his "severe emotional injury" as a result of the incident, the court nevertheless held that the "'reasonable person' component of the emotional injury element of the tort has not been met[.]" Id. at 706. "[T]he conduct by the Mapco employees of which Brown complains does not rise to the level of 'outrageous' but is more appropriately categorized as 'mere insults, indignities, threats, annoyances, petty oppression or other trivialities.'" Id. (quoting Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997)). The court also "conclude[d], as a matter of law, that the Mapco employees' conduct would not cause a reasonable person to suffer serious or severe mental injury; a reasonable person in Brown's circumstance would

shrug off the incident as an 'annoyance' or 'petty oppression' and go about his business." Id.

Likewise in this case, the Court concludes as a matter of law that a reasonable person, normally constituted, would be able to adequately cope with the mental stress engendered by receipt of the letters from DKA. As such, judgment on the pleadings will be granted on Plaintiff's emotional distress claims.

## IV. CONCLUSION

On the basis of the foregoing, the Court will grant Defendants' Motion for Judgment on the pleadings.

An appropriate Order will be entered.

Kevin H. Sharp
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE